UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO.: 9:25-cv-81334-DMM
HON. DONALD M. MIDDLEBROOKS

ALEXIS WARNER,

      Plaintiff(s),

vs.

ELIJAH SCHAFFER,

      Defendant(s).

_____/

## DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Defendant, Elijah Schaffer ("Defendant" or "Mr. Schaffer"), by and through undersigned counsel, hereby moves to dismiss Plaintiff's Complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) and states as follows.

## I.    INTRODUCTION

Plaintiff Alexis Wilkins, a self-described patriotic conservative country artist and public figure, has lodged a single defamation by implication claim against Elijah Schaffer, a political commentator, comedian, and podcast host whose shows mix politics and current events, with a comedic, satirical style. Compl. ¶ 7. Her claim is based solely on Mr. Schaffer's caption-less X post, which simply reposts a true photograph of Ms. Wilkins standing with FBI Director Kashyap Patel ("Director Patel") at a formal event in response to a post about Mossad operations:



Ms. Wilkins concedes that the photograph is authentic and unaltered, and that she had already posted the same image on her own social media accounts. Compl. ¶ 12. Ms. Wilkins also acknowledges that Ms. Wilkins and Director Patel have been the subject of intense public scrutiny and online commentary ever since Director Patel was appointed as Director of the FBI. Compl. ¶¶ 14–15. Long before Mr. Schaffer's post, social media commentators, journalists, and online personalities had already speculated that Ms. Wilkins was an Israeli or "Mossad" "honeypot" who was leveraging her public relationship with Director Patel to advance foreign-policy interests. *See*, *e.g.*, posts and threads attached as Exhibits A–C.

In the Complaint, Plaintiff expressly alleges that "conspiratorial corners of the internet" and social media accounts spread the very narrative at issue here. Compl. ¶ 14. In light of those allegations, Defendant asks that the Court consider these exhibits, along with Exhibits D-G, as materials incorporated by reference or, in the alternative, take judicial notice of them for the limited purpose of showing that the statements were made and the public controversy existed before Mr. Schaffer's post.[1]

---

[1] While a court resolving a motion to dismiss must generally confine its analysis to the four corners of the complaint, a court may consider a document that is incorporated by reference into the complaint. *See Johnson v. City of Atlanta*, 107 F.4th 1292, 1300, 107 F.4th 1292, 1300 (11th Cir.

Ms. Wilkins herself publicly responded to that commentary on X, calling the accusations "insanely ridiculous" conspiracy theories and attributing them to accounts "farming" for engagement. *See* Exhibit D. She then appeared on nationally available podcasts and interviews, such as The Megyn Kelly Show and the *Try That in a Small Town* podcast, where she discussed the same "Mossad/honeypot" theme. Specifically, on the Megyn Kelly Show, she acknowledged and was understanding of the fact that people on the internet connect pieces of her background:

> I think people see certain pieces, and I get it. They want to connect things. They want to justify some of the pain that they've been through watching the last four years. And there's pieces of this that I can, I understand.

*See* Exhibits E and F.

She also described the accusations as "funny" and "truly hilarious" and part of life as a "public figure." *See* Exhibit G.

Yet despite acknowledging that she understands how people might connect aspects of her background, Ms. Wilkins now seeks to bar Mr. Schaffer from participating in that public discussion by demanding more than $5 million in damages on the theory that his repost of her own, concededly truthful photograph in response to an article about national security and foreign affairs amounts to a literal accusation that she is a Mossad agent engaged in espionage and treason. Compl. ¶¶ 21–24. To fabricate that implication, Ms. Wilkins combines Mr. Schaffer's singular post with a Mazzig thread that discusses Mossad operations, pre-existing online speculation about Ms. Wilkins, and a handful of third-party replies, and then attributes the entirety of this to Mr. Schaffer. Compl. ¶¶ 11–18, 22–28. Ms. Wilkins misapplies defamation law. Defamation by implication imposes a strict standard requiring that the defendant's juxtaposition of otherwise truthful facts reasonably convey the alleged defamatory meaning. Simply reposting a true

---

2024). A document is incorporated by reference into a complaint if it is "central to the plaintiff's claims" and "undisputed, meaning that its authenticity is not challenged." *Id.* Here, the X posts, online threads, and interviews discussing the "Mossad/honeypot" narrative are central to Plaintiff's claim because she expressly alleges that "conspiratorial corners of the internet" and social media commentary created and spread the very narrative she now challenges, and she does not dispute the authenticity of the publicly available posts and interviews she authored or participated in. Compl. ¶ 14. However, Mr. Schaffer asks that, regardless of what the Court considers in terms of documents, exhibits, or other citations, it not transform this motion to dismiss into a motion for summary judgment.

photograph of Ms. Wilkins with a public official underneath a true discussion of Mossad operations does not satisfy that rigorous standard.

Additionally, the First Amendment independently bars this claim. As the head of the FBI, Director Patel holds top-level national-security position, and as Plaintiff admits, he is unmarried and has publicly appeared with his girlfriend on numerous occasions. Compl. ¶ 8. The fact that the unmarried Director of the FBI is in a public romantic relationship, and whether that relationship poses any security or foreign-influence concerns, is itself a matter of obvious public interest. Indeed, Ms. Wilkins's public relationship with Director Patel has become the subject of national and international news coverage, especially after it was discovered that the CEO of PragerU (an institution for which Ms. Wilkins provided services) served in military intelligence with the Israel Defense Forces. *See, e.g.*, Alan Feuer, Adam Goldman, and Glenn Thrush, *Patel Under Scrutiny for Use of SWAT Teams to Protect His Girlfriend*, N.Y. TIMES, Nov. 23, 2025, https://www.nytimes.com/2025/11/23/us/politics/kash-patel-girlfriend-fbi-protection.html; Marni Rose McFall, *Full List of People Being Sued by Kash Patel's Girlfriend Alexis Wilkins*, NEWSWEEK, Nov. 11, 2025, https://www.newsweek.com/alexis-wilkins-kash-patel-fbi-defamation-sam-parker-kyle-seraphin-elijah-schaffer-11029236.[2] This type of political commentary, including commentary that is sharp or mocking, lies at the core of First Amendment protections recognized by the U.S. Supreme Court; *see also* Exhibit F.

Plaintiff, however, asks this Court to punish and chill Mr. Schaffer's political commentary, delivered in Mr. Schaffer's characteristic comedic style, about her relationship with the Director of the FBI and about U.S. policy toward Israel, which is precisely the kind of "vehement, caustic, and sometimes unpleasantly sharp attacks" on public issues that the Supreme Court in *New York Times Co. v. Sullivan* held are protected by our "profound national commitment" to uninhibited, robust, wide-open debate. 376 U. S. 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). The First Amendment safeguards that debate by protecting rhetorical hyperbole and figurative epithets and by denying recovery to public figures who cannot plead and prove that defendant had knowledge

---

[2] Mr. Schaffer respectfully requests that the Court take judicial notice of the existence of these articles, not for the truth of the reported details but to show that this relationship has been the subject of national and international media coverage and is of public interest. *See* FED. R. EVID. 201(b)(2).

of the alleged falsity so as to satisfy the "actual malice" element constitutionally required of public figures like Ms. Wilkins.

This case also does not exist in a vacuum. It is one of several lawsuits Ms. Wilkins has brought against other political commentators over similar "Mossad/honeypot" rhetoric, each seeking multi-million-dollar damages awards.[3] In at least one other action, she has sued a conservative former FBI agent and podcaster over similarly hyperbolic commentary about her relationship with Director Patel, even while admitting in that complaint that some of the remarks were "ridiculous" and "ludicrous." *See Wilkins v. Seraphin*, No. 1:25-cv-01375-DAE (W.D. Tex., Austin Div.). This serial litigation underlines that this action is about silencing constitutionally protected commentary on matters of public concern, not remedying any genuine reputational injury.

As the Eleventh Circuit has established, careful examination of pleadings in cases seeking to impose liability on core First Amendment activity is necessary, because "there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016). Florida's anti-SLAPP statute, Fla. Stat. § 768.295, likewise protects the exercise of First Amendment rights by requiring early resolution of meritless suits targeting speech on issues of public concern and by authorizing fee-shifting to prevailing defendants.

Here, Ms. Wilkins cannot identify any false statement of fact; she relies on a defamatory implication that cannot reasonably be drawn from Mr. Schaffer's post; and she fails to plead actual malice even though she is at least a limited-purpose public figure. Therefore, her claim should be dismissed with prejudice. Additionally, due to the meritless nature of her claim, Mr. Schaffer is entitled to his attorneys' fees and costs under Florida's anti-SLAPP statute, Fla. Stat. § 768.295.

## II.   <u>LEGAL STANDARD</u>

Courts should dismiss a complaint that fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To "state a claim," a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8(a)(2) "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl.*

---

[3] *See, e.g.*, *Wilkins v. Seraphin*, No. 1:25-cv-01375-DAE (W.D. Tex., Austin Div.); *Wilkins v. Parker*, No. 2:25-cv-00987-RJS-CMR (D. Utah).

*Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007). To survive a motion to dismiss for failure to state a claim, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). Rather, a party must plead "factual allegations" sufficient to "raise [the plaintiff's] right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Dismissal is therefore permitted when on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Cunningham v. Mimms*, 2023 U.S. Dist. LEXIS 743522, at *4 (S.D. Fla. Apr. 28, 2023) (Middlebrooks, J.) (quoting *Glover v. Liggett Grp., Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006)).

"Courts in this jurisdiction and elsewhere routinely dismiss defamation claims on motions to dismiss." *Borislow v. Canaccord Genuity Grp. Inc.*, 2014 WL 12580259, at *3 (S.D. Fla. Jun. 27, 2014). Early dismissal is "'especially appropriate' because of the chilling effect these cases have on freedom of speech." *Marder v. TEGNA Inc.*, 2020 U.S. Dist. LEXIS 114226, at *7 (S.D. Fla. Jun. 29, 2020).

### III.   ARGUMENT

### A. Plaintiff Fails to State a Claim for Defamation by Implication.

#### 1. Mr. Schaffer's Repost of Ms. Wilkins' Photo in Response to the Mazzig Thread Cannot Be Reasonably Read to Impart the False Innuendo or Affirmatively Suggest That Mr. Schaffer Intends or Endorses the Inference That She is a Mossad Agent Engaged in Espionage and Treason.

Defamation, whether express or by implication, requires falsity. *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1107–08 (Fla. 2008); *Utterback v. Morris*, 2025 U.S. App. LEXIS 12333, at *16–17 (11th Cir. May 21, 2025). Defendant's only publication is a repost of "an actual, literally true, photograph of Ms. Wilkins and Dir. Patel" in response to an article about Mossad operations. Compl. ¶ 22. She does not allege that the image was altered, staged, or taken out of temporal context. To the contrary, she admits that she originally posted the same photograph on her own Instagram account and that she has repeatedly shared images of herself with Director Patel on social media. Compl. ¶¶ 8, 12.

Ms. Wilkins therefore does not attack the truth of what Mr. Schaffer actually published. Instead, she seeks to hold him liable for an alleged "implication" that she is a Mossad agent or "honeypot," which she derives from the subject of the Mazzig thread, prior online conspiracy theories about her, and a handful of third-party replies. However, this defamation by implication claim fails as a matter of law.

The elements of defamation by implication are (1) a juxtaposition of a series of facts so as to imply a defamatory connection between them, or (2) the creation of a defamatory implication by omitting facts. *See Rapp*, 997 So. 2d at 1106. Defamation of a public figure by implication also requires proof of actual malice because it "is subsumed within the tort of defamation . . . [so] all of the protections of defamation law . . . [are] extended to the tort of defamation by implication." *Id.* at 1108. In determining whether a statement is reasonably capable of the defamatory meaning, the court must evaluate the challenged publication from the perspective of the **ordinary reader**. *See Turner v. Wells*, 879 F.3d 1254, 1262–63 (11th Cir. 2018) (explaining that, under Florida law, whether a statement is reasonably capable of a defamatory meaning is a question of law for the court, which evaluates the challenged publication from the perspective of the ordinary reader).

Several courts of appeals have held that, to state a claim for defamatory implication, the alleged implication must be present in the "plain and natural meaning of the words used," and where the expressed facts are literally true, the U.S. Constitution's "sanctuary for truth" requires an "especially rigorous showing" that the challenged communication not only can be reasonably read to impart the false innuendo, but also "affirmatively suggest[s] that the author intends or endorses the inference." *See Biro v. Condé Nast*, 883 F. Supp. 2d 441, 464 (S.D.N.Y. 2012); *Chapin v. Knight-Ridder*, 993 F.2d 1087, 1093 (4th Cir. 1993) ("The language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference."); *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990) ("If the communication, by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting that the defendant intends or endorses the defamatory inference, the communication will be deemed capable of bearing that meaning.").

Further, Florida courts have rejected efforts to manufacture defamatory meaning by stretching non-defamatory content based on how some viewers might react to it. *See Readon v. WPLG, LLC*, 317 So. 3d 1229, 1237–38 (Fla. 3d DCA 2021) (holding that broadcaster's accurate

report about plaintiff's prior lawsuits, viewed as a whole, did not falsely imply ongoing deceitful business practices and warning that expanding defamation-by-implication doctrine would chill truthful reporting).

Because the expressed facts are literally true (Defendant reposted Plaintiff's authentic photograph in response to reporting about alleged Mossad agents), Plaintiff should make an especially rigorous showing that an ordinary viewer would understand the repost to affirmatively suggest Defendant intended or endorsed the alleged defamatory inference. *See Biro*, 883 F. Supp. 2d at 464; *Chapin*, 993 F.2d at 1093; *White*, 909 F.2d at 520. She cannot meet that burden here because Defendant merely reposted Plaintiff's own, admittedly accurate photograph in response to a third-party thread about the FBI, Israel, and alleged foreign influence with no additional language, framing, or contextual cues.

The only context Plaintiff relies on is external and not attributable to Defendant: the Mazzig thread, prior online conspiracy theories, and a few stray reactions from other users. Compl. ¶¶ 11–18, 22–28. Likewise, the only concrete allegations about Mr. Schaffer himself are that he has criticized Israel, expressed "disdain" for Director Patel, and posts provocative political content. Compl. ¶¶ 17–18, 25. None of that turns his repost of a true photograph into a defamatory implication that Ms. Wilkins herself is engaged in espionage and treason, nor does it plausibly or affirmatively suggest that Mr. Schaffer endorses the inference that she is engaged in espionage and treason, or that he acted with actual malice. The fact that some viewers may read their own assumptions into Mr. Schaffer's post does not turn it into a statement that an ordinary reader would understand as accusing her specifically of espionage.

### 2. The Alleged Implication Fails the Ordinary Reader Test.

Plaintiff alleges that an "ordinary viewer" would understand Mr. Schaffer's statement (an unaltered image of Plaintiff and Director Patel) to unmistakably insinuate that she is "a spy for a foreign government, conducting espionage to undermine our national security and to manipulate federal law enforcement at the highest level, and even committing treason." Compl. ¶ 14. Yet she simultaneously describes this alleged implication as "inherently ludicrous." Compl. ¶ 27. That acknowledgment underscores that an ordinary viewer would not understand Mr. Schaffer's post as a literal accusation that she is a foreign spy committing treason. Reasonable viewers could instead understand the post, for example, as commentary on the broader security risks when an

8

unmarried FBI Director openly dates, or as criticism of Director Patel's judgment, without reaching any conclusion that Ms. Wilkins herself is engaged in espionage.

To reach Plaintiff's preferred interpretation, the Court must start with the Mazzig thread's discussion of female Mossad agents; assume that any woman pictured with a powerful man must be one of those agents; add in prior online conspiracy theories about Plaintiff that pre-dated the post; and then treat a wordless photograph as a literal accusation that she is committing espionage against the United States. Defamation liability cannot be based on an interpretation that depends on so many assumptions an ordinary viewer would not draw from the post itself.

Allowing Plaintiff's claim to proceed would invite litigants to comb through social media posts for the harshest interpretation any portion of viewers might adopt and punish speakers for those third-party interpretations. Such result would be inconsistent with the First Amendment and with Florida's limited doctrine of defamation by implication.

### 3. The Alleged Implication is Non-Actionable Opinion and Rhetorical Hyperbole Protected by the First Amendment.

Even if the Court were to credit Plaintiff's interpretation of the post, any suggestion that she is a "Mossad honeypot" targeting the Director of the FBI is, at most, political rhetoric and hyperbole protected by the First Amendment, not a concrete, factual allegation of criminal espionage (especially from a political podcaster and comedian who mixes his commentary with humor and sarcasm).

The Eleventh Circuit has repeatedly held that non-literal attacks, such as rhetorical hyperbole and ridicule, are not actionable because they cannot reasonably be understood as stating actual facts about an individual. *See Horsley v. Rivera*, 292 F.3d 695, 701–03 (11th Cir. 2002) (statements accusing plaintiff of being an "accomplice to murder" were protected rhetorical hyperbole). Indeed, Courts routinely hold that political rhetoric about public figures far harsher than anything alleged here is protected as opinion or rhetorical hyperbole. *See*, *e.g.*, *Greenbelt Coop. Publishing Ass'n v. Bresler*, 398 U.S. 6, 13-14, 26 L. Ed. 2d 6, 90 S. Ct. 1537 (1970) (calling a developer's negotiating position "blackmail" was non-actionable rhetorical hyperbole); *Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 284, 41 L. Ed. 2d 745, 94 S. Ct. 2770-86 (1974) (use of the word "traitor" in union newsletter was protected rhetorical hyperbole); *Horsley v. Rivera*, 292 F.3d 695, 701 (11th Cir. 2002) (television host's remark about plaintiff being an

"accomplice to murder" was non-actionable opinion and hyperbole protected by the First Amendment as an "imaginative and figurative expression" that could not have been taken by a reasonable viewer as a literal assertion of facts.); *Rosenthal v. Council on Am.–Islamic Relations– Fla., Inc.*, 2017 Fla. Cir. LEXIS 18229, at *21–22 (Fla. 17th Cir. Ct. Aug. 14, 2017) (anti-SLAPP order dismissing defamation claim based on accusations that plaintiff was a "radical anti-Muslim activist" and supporter of terrorists, characterizing those statements as protected political commentary). Against that backdrop, even if some readers took Mr. Schaffer's statement to allude to the idea that Ms. Wilkins is a "Mossad honeypot," that would fall squarely within the kind of exaggerated, sarcastic political commentary that courts treat as protected opinion or hyperbole, not a literal accusation of espionage. And, as she herself alleges, Ms. Wilkins recognizes the "inherently ludicrous" nature of any suggestion that she is a Mossad agent. Compl. ¶ 27.

In sum, Plaintiff cannot convert political hyperbole and online snark into a multimillion-dollar defamation claim simply by relabeling those jokes and jabs as literal charges of treason and espionage. Regardless, her claim fails because she has failed to sufficiently plead actual malice.

## B. Plaintiff is at Least a Limited-Purpose Public Figure and Fails to Plausibly Plead Actual Malice.

### 1. Plaintiff is a Limited-Purpose Public Figure.

Determining whether a plaintiff is a public figure, who is subject to the actual malice analysis, "is a question of law for the court to decide." *Michel*, 816 F.3d at 702. "An individual may qualify as a public figure either generally—that is one with such fame and notoriety that he will be a public figure in any case—or for only limited purposes, where the individual has thrust himself into a particular public controversy and thus must prove actual malice in regard to certain issues." *Berisha v. Lawson*, 973 F.3d 1304, 1310–11 (11th Cir. 2020) (internal quotation marks omitted). A public controversy concerns an issue that "had foreseeable and substantial ramifications for nonparticipants." *Silvester v. Am. Broad. Cos. Inc.*, 839 F.2d 1491, 1495 (11th Cir. 1988) (internal quotation mark omitted).

Here, at a minimum, Ms. Wilkins is a limited-purpose public figure. First, there is an undeniable public controversy. Plaintiff's own allegations and the judicially noticeable news coverage show active public debate over (1) the independence and leadership of the FBI under Director Patel, and (2) alleged foreign influence, particularly Israeli influence, on U.S. political

and media institutions, including PragerU and related organizations. *See id.* (explaining that public controversy exists where the issue has "foreseeable and substantial ramifications for nonparticipants"). That controversy plainly has "far-reaching impact on the public" because it goes to national-security risks, foreign intelligence services, and the integrity of federal law-enforcement leadership. *See Jacoby v. CNN, Inc.*, 2021 U.S. App. LEXIS 36594, at *9 (11th Cir. Dec. 10, 2021) (holding that case involved matter of public concern because controversy had "far-reaching impact on the public").

Second, Plaintiff has voluntarily played a central role in that controversy. Under Eleventh Circuit precedent, individuals who voluntarily inject themselves into a public controversy and use media platforms to influence that debate are, at the least, limited-purpose public figures. *See, e.g.*, *Jacoby*, 2021 U.S. App. LEXIS 36594, at *9; *see also Michel*, 816 F.3d at 702; *see also Berisha*, 973 F.3d at 1310–11. Here, Ms. Wilkins describes herself as a "patriotic conservative country artist," "published writer," and political activist that worked for PragerU; hosts and appears on political-commentary programs; and publicly promotes her relationship with the sitting Director of the FBI as "widely known." Compl. ¶¶ 7–8. As noted previously, she has repeatedly addressed, in national media interviews and on her own social media accounts, the very "Mossad" and "honeypot" themes at issue here, sometimes describing the accusations as "funny" or "truly hilarious" and acknowledging that, as a public figure, she expects people to "connect pieces" of her background and speculate about her motives. *See* Exhibit E–G. In doing so, she has "thrust [herself] to the forefront" of the public dispute over whether her relationship with Director Patel raises national security or foreign influence concerns. *Turner*, 879 F.3d at 1272.

Third, the challenged content is germane to Plaintiff's role in that controversy. Mr. Schaffer's post consists of a photograph of Ms. Wilkins and Director Patel that she herself circulated, reposted in the middle of an ongoing online debate about whether her relationship with the Director reflects inappropriate foreign influence. The alleged implication (that she is a "Mossad honeypot" or foreign agent) goes directly to the same questions about her background, motives, and relationship with Director Patel that she and others have been publicly discussing. *See Berisha*, 973 F.3d at 1310 (noting that limited purpose status turns on whether the challenged statements are "germane to the plaintiff's role in the controversy").

On these facts, Ms. Wilkins is, at minimum, a limited-purpose public figure. As such, she must plausibly allege that Mr. Schaffer acted with "actual malice," i.e., that he entertained serious

doubts about the truth of the published account or was otherwise "highly aware" that the account was likely false. *Michel*, 816 F.3d at 703.

### 2. Plaintiff Fails to Plausibly Allege That Mr. Schaffer Acted with Actual Malice.

Because Plaintiff is at least a limited-purpose public figure, she must allege facts showing that, when Mr. Schaffer made the post, he either knew the "Mossad" implication was false or seriously doubted whether it was true. *See Sullivan*, 376 U.S. at 279–80. Instead, she simply recites that he acted "knowingly," "intentionally," "willingly," "wantonly," "maliciously," and with "malice." Compl. ¶¶ 25–27, 30. Those are precisely the sort of "labels and conclusions" that *Twombly* and *Iqbal* deem insufficient. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. Additionally, as the Eleventh Circuit has established, "[i]ll-will, improper motive or personal animosity plays no role in determining whether a defendant acted with actual malice." *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1198 n.17 (11th Cir. 1999) (quotation marks omitted); *see also Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 510 (1991); *Michel*, 816 F.3d at 702–03.

For example, in *Reed v. Chamblee*, a professional golfer who left the PGA Tour to join the Saudi-backed LIV Golf league sued television commentators, writers, and media outlets over statements that he had taken "blood money" from Saudi Arabia and had a long history of cheating and unethical conduct during tournaments. Reed filed two lengthy complaints alleging that defendants "knowingly" and "recklessly" published false statements, were motivated by hostility toward him and LIV Golf, failed to investigate, and republished accusations made by others. The Eleventh Circuit affirmed dismissal of all claims, characterizing the complaints as a "litany of conclusory allegations" that were merely formulaic recitations of the "actual malice" element and establishing that bare assertions of ill will, bias, motive, or failure to investigate, without concrete facts showing that defendants actually doubted the truth of their reporting, do not satisfy the actual-malice standard at the pleading stage. *Reed v. Chamblee*, 121 F.4th 1345, 1350–52, 2025 WL 1874638, at *10–12 (11th Cir. 2025).

Similarly, in *Michel*, the Eleventh Circuit affirmed dismissal of public-figure defamation claim where plaintiff alleged bias, motive to increase readership, and failure to investigate, holding that such allegations did not show defendant "actually entertained serious doubts" about the truth of the publication. *Michel*, 816 F.3d at 702–03.

Here, Plaintiff's actual malice claim essentially rests on three points: (1) that Mr. Schaffer holds strong views about Israel and U.S. foreign policy; (2) that he has "obvious animus" against Director Patel and once called him a "traitor"; and (3) that he benefits when his posts draw engagement. Compl. ¶¶ 17–19, 25–27. Under Eleventh Circuit case law, these allegations of bias, ill will, or a motive to boost viewership do not, without more, plausibly allege actual malice.

Nor does Plaintiff allege any facts showing that Mr. Schaffer knew the supposed "Mossad" implication, Plaintiff's only interpretation, was false. Her assertion that she had previously "publicly stated" that the rumors were false is not enough to meet the actual malice pleading standard. Compl. ¶ 27. Courts have made clear that a subject's disagreement with or denial of the accusations, standing alone, does not show actual malice. *See Turner*, 879 F.3d at 1273–74. Moreover, Ms. Wilkins's decision to publicly address these rumors underscores that speculation about her supposed Mossad ties long predated Mr. Schaffer's photo and was already a matter of public controversy.

In short, Plaintiff alleges no facts showing that Mr. Schaffer adopted the implication she claims, or that he believed it was false or seriously doubted it. Additionally, Plaintiff does not point to anything Mr. Schaffer has ever said about her. Her defamation claim rests on conclusory labels, allegations of political hostility, and one factual photograph. As such, her Complaint should be dismissed as a matter of law.

### C. Defendant is Entitled to Anti-SLAPP Relief Due to the Meritless Defamation Claim.

Florida's anti-SLAPP statute protects speech "in connection with a public issue," including "any written or oral statement" made in a public forum or in connection with an issue of "public concern." Fla. Stat. § 768.295(2), (3). It prohibits lawsuits that are "without merit and primarily because such person or entity has exercised the constitutional right of free speech in connection with a public issue" and authorizes an award of attorneys' fees and costs to prevailing defendants. Fla. Stat. § 768.295(2), (3), (4).

Federal courts in this District, including this Court, routinely apply § 768.295 in defamation cases and award fees once the underlying claims fail on the merits. *See*, *e.g.*, *Vesselov v. Harrison*, No. 23-80791, 2024 U.S. Dist. LEXIS 1971, 2024 WL 536061, at *15–16 (S.D. Fla. Jan. 4, 2024) (awarding fees under § 768.295(4) after dismissing defamation claims arising from reporting on pending litigation, concluding the claims were "without merit" and "arose out of protected First

Amendment activity"); *Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1128–30 (S.D. Fla. 2021) (Ruiz, J.) (awarding fees under § 768.295(4) after dismissing defamation claims where political-commentary broadcast about the Mueller investigation was protected speech on a public issue). As this Court has explained, the statute is aimed at preventing meritless suits that chill speech on public issues, and it entitles the prevailing party to anti-SLAPP relief and fees when the court finds the action "without merit." *See Vesselov*, 2024 WL 536061, at *15–16 (holding claims were "without merit" and awarding fees under § 768.295(4))

As shown above, Plaintiff's claim is "without merit" under settled Florida and Eleventh Circuit law. The Complaint does not plausibly allege a defamatory implication created by his own publication; and Plaintiff, as a limited-purpose public figure, fails to plead actual malice. Plaintiff's claim is aimed primarily at punishing and deterring commentary on the relationship between a prominent political commentator, a high-ranking federal official, and foreign policy rather than remedying any genuinely false factual statement. Under the framework applied in *Vesselov* by this Court, once the Court dismisses Plaintiff's defamation claim as a matter of law, this action qualifies as "without merit" and triggers the statute's mandatory fee-shifting provision.

Moreover, Plaintiff's own allegations and filing history show that this case is part of a broader effort to silence commentary on the same "Mossad/honeypot" theme. She has recently brought other defamation suits against commentators who criticized her relationship with Director Patel using similar rhetoric.[4] This lawsuit, like those, targets speech on matters of public concern and seeks to deter others from engaging in that debate. That is precisely the type of suit Florida's anti-SLAPP statute is meant to address.

The statute further directs that such actions "must be resolved at the earliest possible stage of litigation." Fla. Stat. § 768.295(4). Consistent with *Vesselov* and *Corsi*, the Court should dismiss the Complaint, declare this action "without merit" under § 768.295, and award Defendant his reasonable attorneys' fees and costs incurred in defending this suit.

## IV.    **CONCLUSION**

Plaintiff's claim fails as a matter of law. The only content attributable to Mr. Schaffer is a repost of truthful, caption-less photograph in response to a thread about national security and

---

[4] *See, e.g.*, *Wilkins v. Seraphin*, No. 1:25-cv-01375-DAE (W.D. Tex., Austin Div.); *Wilkins v. Parker*, No. 2:25-cv-00987-RJS-CMR (D. Utah).

Mossad operations. His publication does not contain any false statement or actionable defamatory implication. Because Plaintiff has not plausibly alleged falsity, a reasonable defamatory meaning, or facts showing actual malice, and because Mr. Schaffer's statement is protected First Amendment activity, the Court should dismiss her defamation claim with prejudice and award Defendant his reasonable attorneys' fees and costs pursuant to Fla. Stat. § 768.295 and any other applicable authority.

**WHEREFORE,** Defendant respectfully requests that the Court:

i. grant this Motion and dismiss the Complaint with prejudice;
ii. enter judgment in favor of Defendant and against Plaintiff;
iii. award Defendant his reasonable attorneys' fees and costs pursuant to Fla. Stat. § 768.295 and any other applicable authority; and
iv. grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

**LLOPIZ WIZEL, LLP**
1451 W Cypress Creek Rd 300
Fort Lauderdale FL 33309
Telephone: (754) 312-7389

*/s/ Onier Llopiz*
Onier Llopiz
Florida Bar No. 579475
E-mail: ol@l-wfirm.com
E-mail: admin@l-wfirm.com

Joan Carlos Wizel
Florida Bar No. 37903
Email: jcw@l-wfirm.com
E-mail: cp@l-wfirm.com

Jaclyn M. Sanchez
Florida Bar No. 1049836
Email: jcw@l-wfirm.com
E-mail: cp@l-wfirm.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served via CM/ECF on this 5th day of January, 2026 to the following:

## SERVICE LIST

Jason C. Greaves, Esq. (FBN 1059179)
Jared J. Roberts, Esq. (FBN 1036550)
BINNALL LAW GROUP
717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
Fax: (703) 888-1930
jason@binnall.com
jared@binnall.com
Counsel for Plaintiff Alexis Wilkins

*/s/ Onier Llopiz*
Onier Llopiz

# EXHIBIT A

Sam Parker (@BasedSamParker), X.com (Feb. 24, 2025, 3:57 A.M.), https://archive.ph/h7X2v; https://x.com/BasedSamParker/status/1893872 813930655996





**Sam Parker** 🇺🇸 🔥 ✓ @BasedSamParker · Feb 23

📕 3/ Alexis's Biographical Details

Alexis was born in 1999 in Boston, MA, then spent most of her childhood in England & Switzerland while her father attended the University of Geneva School of Economics & Management. She attended the College du Lemon International School in

Show more

each other. I was so excited to be a part of it." Alexis is an only child. Her admiration for veterans started with her family. "My family has always been huge veteran supporters and I come from a line of veterans," she explains. "My great-grandpa was in World War II and then my papa was in the Korean War. And my parents were always really big advocates of history, and learning history, because history learned does not repeat itself. I was never the kid in history class who asked, 'Why do we have to learn this?'"

≡   y!entertainment   Sign in

Entertainment News   'Reacher' star Alan Ritchson

**Kash Patel is dating Alexis Wilkins.**

Wilkins spent most of her childhood in Switzerland and England, before the family finally settled in Nashville, Tennessee. In an interview with Independent Women's Forum, Wilkins revealed that her father has served in the US Navy during the Korean war. "He was the son of Armenian immigrants who fled genocide. My passion for veterans started through conversations with him," shared Wilkins.

💬 22        🔁 96        ♡ 722        ᴸ 213K        🔖  ⤴



















**Sam Parker** 🇺🇸 🔥 ✔ @BasedSamParker · Feb 23

📕 12/ Ties to Intelligence

Not only is she now dating the director of the FBI, Kash Patel, but she is also the press secretary of Abe Hamadeh, a Captain in US Military Intelligence and a newly member of Congress.

One might ask how an undergrad from Belmont College has achieved
Show more

💬 19        🔁 114        ♡ 720        📊 74K        🔖 ⬆️





**Sam Parker** 🇺🇸 🧯 ✔ @BasedSamParker · Feb 24

📕 14/ Addendum: How They Met

Alexis met Kash Patel at a Christian Nationalist rally called ReAwaken America, launched by General Mike Flynn & prominent Q movement believers.

Again, why is a 24-yr devout Christian, hooking up with a Hindu Indian, old enough to be her dad, at a

Show more

*Kash Patel and Alexis Wilkins reportedly met at a*

💬 59        🔁 128        ♡ 820        ᴸ 71K









# EXHIBIT B

Ian   Malcolm,   (@IanMalcolm84),   X.com   (Feb.   28,   2025,   3:01   P.M.), https://x.com/IanMalcolm84/status/1895580008594489794.



# EXHIBIT C

Dr.   Simon Goddek      (@goddeketal),      X.com (Jul.   7,     2025,  4:22   P.M.),
https://archive.ph/D0BuC#selection-613.0-613.229,
https://x.com/goddeketal/status/1942257954251473210



# EXHIBIT D

Alexis Wilkins (@AlexisWilkins), X.com (Jul. 9, 2025, 3:50 P.M.),
https://archive.ph/MO27T;
https://x.com/AlexisWilkins/status/1943050167130746916.



# EXHIBIT E

Transcript of The Megyn Kelly Show, *County Singer and Kash Patel's Girlfriend on the Need to Speak Out About What's True*

Megyn Kelly, *Country Singer and Kash Patel's Girlfriend Alexis Wilkins on the Need to Speak Out About What's True*, The Megyn Kelly Show (Jul. 30, 2025), https://www.youtube.com/watch?v=kCQkaSxMtcQ

**Speaker 1 – Megyn Kelly**  00:57

All right, so this becomes relevant. I'm not just making small talk, because you will, in 2025 America be accused of being an Israeli spy, that you work for Mossad, and near as I can tell, this is only because you're dating Kash Patel. That's probably it, to be honest. But, but I guess if we have to go to a second criterion, it would be that you've done work with PragerU, with our friend Dennis Prager, who is totally brilliant, and that institution has produced a lot of conservatives who are all over the internet. I think you might be the first of being accused of being an Israeli spy, just because you've done a stint with PragerU, but do you think I have the entirety of the evidence quote against you spelled out here?

**Speaker 2 – Alexis Wilkins**  01:50

I think that's it, you know. I think people see certain pieces, and I get it. They want to connect things, they want to justify, you know, some of the pain that they've been through watching the last four years. And there's pieces of this that, you know, I can-I understand, but I think that they've taken just these pieces of evidence that you've laid out and tie them together in all of the wrong ways. I think, you know, PragerU is a great institution that is, as you know, Megyn, sets out to educate the youth, you know, make short form content to try to influence people's opinions, educate them on things that they might not understand, constitutional education. I focused a lot in constitution and policy education in my videos, you know, all of this was to speak out about my experience in college and try to tell the youth that they don't have to bend the knee to the left woke institution and make content that would be of good service to the youth, as I decided that I couldn't stay silent anymore. So seeing these things twisted is not only very confusing, very out of left field for me, but also incredibly disheartening.

**Speaker 1 – Megyn Kelly**  05:00

Because this is relevant too, I'm not being unnecessarily probing. It's just that people are accusing you of sort of being the honey pot where, you know, like, they'll send over a spy to sort of get one of our officials, like an Eric Swalwell type, to sleep with them, like China does this, and some of these dopes do it, and before they know it, they've been compromised. And by the way, there's been like no follow up on him

and that whole thing, but that's what some have said. ==But you, boy, if you're, if you're a spy trying to get== in with Trump administration officials, you are really playing the long game, two and a half years before
Trump even got into office, picking some random associate of Trump's and betting on him becoming our FBI chief.

**Speaker 2 – Alexis Wilkins** 05:39
==Right? It would have been a really long game play.== And the thing here too, is that, you know, you don't know where life is going to go. You don't know where these things are going to take you. You… Even before I met Kash, you know, being committed to this movement and saying, "Okay, there's something seriously wrong with our country." And there's sacrifices in music that I'm being asked to make, and there's sacrifices in college that I'm being asked to make. You know people that want you to donate to certain super PACs in order to get on certain tours. It's egregious, the things that you run into, and you either go, "Okay, I'm either going to be a part of this or I'm going to speak against it." ==And my values led me to speak against it, and so to live my life, you, very publicly, honestly. I mean, my, my social media, goes back, you know, far enough to tell that that I have a long history of this, of speaking about American values and making sure that people know exactly where I'm coming from. You know, I've worked with veterans organizations for a long time. These are the things that I've held for a long time, the beliefs I've held for long before I met him, and so it's hard when you make these decisions to sacrifice what I think the mainstream would call success in your career, to commit to an ideology and speak out against what the Biden administration was doing, have my show on rumble weekly, call between the headlines where I was calling all of this out==… For people to act like there's not enough information out there about me to glean a real conclusion on all of this kind of vigilante research is bizarre to me, you know, as a… as a… pretend I'm a third person. It just, it doesn't make any sense.

# EXHIBIT F

Transcript of The Megyn Kelly Show, *FBI Director Kash Patel's Girlfriend Alexis Wilkins Responds to Internet Trolls Who Say She's Mossad*

Megyn Kelly, *FBI Director Kash Patel's Girlfriend Alexis Wilkins Responds to Internet Trolls Who Say She's Mossad*, The Megyn Kelly Show (Jul. 30, 2025), https://www.youtube.com/watch?v=S10WGaxrSlI

**Speaker 1 – Megyn Kelly** 00:00

You, this gal who grows up for large part in Arkansas, attracted to country music. You become a country music singer and star. You are very involved in veterans' charities. You're Christian. You went to a Christian university. You stood up for yourself without doing the liberal talking points there, made a record of what they were doing to you. You get a show on Rumble. I mean, this is like, you know, basically your next step will be Fox News Correspondent in the grand scheme of life. But for some reason, the Epstein thing gets blamed on you, and there's a lot of this on the internet. There are people with millions and millions of followers in posts that have been seen millions and millions of times accusing you of being a spy for Israel, mostly, mostly Mossad spy. Could be other spies. We cut just one in sound bite form, but there's so much more. Here's just a sample.

**Speaker 2 – Sample Sound Bite** 00:52

Is the director of the FBI caught up in an Israeli honey pot operation? All right, here's the context. Quote. "Some social media users have wondered whether the FBI and the U.S. Justice Department's refusal to release the list of Jeffrey Epstein's clients could have something to do with Alexis Wilkins, the 26 year old girlfriend of 45 year old FBI Director Kash Patel." This is what people online are pointing to, the fact that Patel's girlfriend Alexis Wilkins works for PragerU, which is a media company that supposedly espouses American values, except for the fact that it is run by a former Israeli military intelligence officer. Now I did a bunch of digging, and unfortunately, there's actually not a lot of public information to go off of in terms of Alexis Wilkins background. She lived in England and Switzerland before settling in Fayetteville, Arkansas when she was nine. It also says that she attended college, du Lemon International School, in Switzerland. Now, interestingly, Chat GPT is calling this a strange biographical gap in that she has no visible friend network or public high school college cohort interviews, which they say is unusual for a public figure in entertainment, and that if a Mossad asset were inserted early in life, these gaps would be precisely where you would hide alternate history or handler training. Anyway, I'm not sure what's true or what's not true, but evidently these are quote classic elements used in honey pot operations: soft power, ideological alignment, and sexual emotional entanglement.

**Speaker 1 – Megyn Kelly**  02:22

Okay. The only piece of that that I can glean that is actually true is the CEO of PragerU is actually, acknowledges on her bio that she served in military intelligence with the IDF. So she, the CEO of PragerU has an affiliation, but there's nothing like that about you. So when's this started coming out? Were you shocked? I mean is, do you think this is really, basically just that you're with Kash?

**Speaker 3 – Alexis Wilkins**  02:48

I was shocked. I knew that, you know, that Prager was, this is kind of something that, I think, people in the deep sides of the internet like to pick at, you know, when they can't figure out what else is wrong, so some of it didn't surprise me when it first started coming up. I was like, all right, you know, this looks like this is what they're focusing on today. But then to your point, Megan, these posts got millions of views. And you know, I could list all the ways that this hurt me and my family, but some examples are the fact that people begin harassing you, people start doxing your family, people start, you know, accusing you, just aside from all the other stuff that's hurtful, the fact that I've dedicated myself to this movement, to good values, to speaking to children, to doing things that I thought were good, that were in line with my values, but also the fact that it's accusing me of manipulating the person that I'm with, that I love. You know, that's a horrible accusation. And seeing this pop off on the internet. I think the initial ones actually didn't tag me, so it was very bizarre to kind of start to see this roll in on my twitter and it not being a—or my X—and it not being a good influx of what people were talking about was very surprising. Yes.

**Speaker 1 – Megyn Kelly**  03:56

Now what, what did Kash say? Because it's always, it's easier to take the slings and arrows yourself than to see them come to your loved one.

**Speaker 3 – Alexis Wilkins**  05:57

I think so. I, you know, I think that it's, it's hard when you see anyone you love being attacked for something that you're doing. You know, I've encountered it on the smaller scale, as I've been a public figure for long enough to see, you know, people try to pick at my, you know family, try and find people online. You know, they, this is something that people do. Hence, you know, it's funny, referring back to the Chat GPT investigation that was held on, on the site you played, you know, that there aren't any interviews of my friends? Well, there aren't any interviews of my friends because I don't want the internet to attack them, you know, I think it's

pretty sensical. But no, he, he's, he's dedicated to the American people as he always has been. You know, I think that what, when people get into government, they, they don't just, you know, snap into something else. You know, people have the same mission that they did on the campaign trail and, and, during the time before they were in government, which is really all I can say on that. But I think that, you know, ultimately, it's been hard to see me come into the line of fire for something he's already dealing with.

# EXHIBIT G

Transcript of Try That in a Small Town Podcast, *Bison Heads and Spy Accusations – A Chat w/ Alexis Wilkins: Ep 67*

*Bison Heads and Spy Accusations – A Chat w/ Alexis Wilkins :: Ep 67*, Try That in a Small Town Podcast (Aug. 4, 2025), https://www.youtube.com/watch?v=ZipsSEtZb84

25:24

Okay, so that's interesting. Let's know, would you ever consider getting into politics?

25:31

She already is.

25:32

Well, you are kind of, kind of, but you're a little displaced.

**Alexis Wilkins** 25:37

I think, I think that I live in a, you know, I know people like to say never say never to these questions and leave it a little cheeky, but I, this is, this is a tough industry. The political industry is a tough industry and I think that ultimately, looking at the ins and outs of it. I'm really happy to be on the commentary and educational side. I love the Constitution. I love teaching people about the Constitution. I love informing people about their God given rights, because it's not taught in schools anymore the way that it should be. I know that I learned that from my parents, my grandparents, my grandpa that I call Papa, he served in the Korean War. I didn't learn about the Korean War in school. What's wrong with that? And so I'm really happy being on this side of things. And you know, being a, being a small leg of support to the political system, or not system, but you know, to that realm of things, I'm happy in that spot. And if that ever changes, you know, I feel like that's something I can assess as we go along.

26:46

Can you still run for office if you're a spy?

26:49

Now, that's, that's a great question.

26:52

That's a great, that's a great question. [overlapping discussion].

26:57

I gotta check it out. There's rules we have here.

**Alexis Wilkins** 26:59
<mark>Someone had to take the air out of the balloon.</mark> You know.

26:57
You gotta say, I read that, and <mark>knowing you, it gave me a really good laugh.
Because if you are a spy,</mark> you're a really good spy.

**Alexis Wilkins** 27:12
<mark>I should have taught classes, honestly. Yeah. It's, it's funny, and it's, it's, it's hard,
because it's in the thick of it now, as of, as of us recording this, and I, I like levity on
it, because I think that's the only way to deal with things. So I think it's, yeah, there's
elements of it that I think are truly hilarious.</mark> There are elements of it that I think
are, you know, you read these things about yourself, and you go, it almost, almost
makes you more sad that they're using photos and of memories that made you
happy. You know, they're like, they're like, clipping photos. There's a clip of a
photo. Now, I don't want to say this and everyone go, you know, mean people go
and hunt for it, but it's already up there. There's a photo of, you know, my, my
grandpa, who I was just saying, I call Papa, who is passed on now, and they are
going and hunting that photo down and putting it on the internet and, you know,
desecrating what it means to me or not means to me, but you know what it means in
the public specter and trying to make a thing out of it, and chase these things down,
trying to find my family. And there's a photo of me and my dad on my first
Halloween, and they clip this and put it online and try to make it, you know,
something horrible. And it's, um, it's, it's definitely a unique experience. There's not
really a support group for this kind of thing, which is fine, but it's, yeah, it's, it's, it's
fascinating, but you're right. I mean, given the circumstances, I would have been
doing a bang up job. That was the truth.

28:34
Maybe she's a spy. But she's really good. So funny.

28:43
It was like, well, and it's obviously, you know, we can bring some levity to it, but it's
awful, I'm sure, and just to have those accusations is unfathomable.